# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| AMEENA BROWN and EVAN BRAGGS, Individually and as Co-Administrators of the Estate of A.B., deceased, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No.: N20C-01-067 FJJ |
| v. | ) ) | |
| FISHER-PRICE, INC. and MATTEL, INC., | ) ) ) | |
| Defendants. | ) | |

Submitted: April 16, 2025
Decided: April 30, 2025

**OPINION AND ORDER**
*On the Parties Pretrial Motions*
**GRANTED in part and DENIED in part.**

*Robert J. Leoni, Esquire,* Shelsby & Leoni, Newark, Delaware and *Michael A. Trunk, Esquire*, (Pro Hac Vice) Kline & Specter, P.C., Philadelphia, PA, *Attorneys for Plaintiffs.*

*Jennifer C. Wasson, Esquire, and Ryan D. Kingshill, Esquire*, Potter Anderson & Corroon, LLP, Wilmington, Delaware, and *Steven B. Weisburd, Esquire, and Jan E. Dodd, Esquire*, (Pro Hac Vice) Shook, Hardy, and Bacon LLP, Los Angeles, California, and Ryan Cobbs, Esquire, (Pro Hac Vice) Shook, Hardy, and Bacon, LLP, Miami, Florida, *Attorneys for Defendants*

**Jones, J.**

Plaintiffs Ameena Brown and Evan Braggs ("Plaintiffs") have filed the instant product liability action against Defendants Fisher-Price, Inc. and Mattel, Inc. ("Defendants") following the death of their infant son, A.B.  The Complaint alleges that A.B.'s death was caused by Fisher-Price's Rock 'n Play Sleeper ("RnP") which was an inclined sleep product designed and marketed for day use or overnight sleep where infants are placed in a spine position at an angle.  Trial in this matter is scheduled for June 2025.  The Parties have filed numerous pretrial motions, including Daubert motions, which this opinion addresses.

## STANDARD OF REVIEW

A number of the motions address the testimony of proposed experts and are essentially *Daubert* challenges.  The Court will consider those motions and, as such, will first need to set forth the standard of review for Daubert motions.

Delaware Rule of Evidence 702 governs the admissibility of expert testimony. Delaware has adopted the holdings in *Daubert v. Merrell Dow Pharmaceuticals Inc.*[1] and *Kumho Tire Co., Ltd. v. Carmichael*[2] to interpret the Delaware Rule.[3] In *Daubert* and *Kumho*, the United States Supreme Court

---

[1] 509 U.S. 579 (1993).
[2] 526 U.S. 137 (1993).
[3] *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 794 (Del. 2006) (citing *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 522 (Del. 1999)).

interpreted and explained Federal Rule of Evidence 702, which is "substantially similar" to the Delaware Rule.[4] Delaware Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has applied the principles and methods reliably to the facts of the case.[5]

To be admissible, expert testimony must be "relevant and reliable."[6] To make this determination, the trial judge engages in a five-step analysis.[7] This analysis provides that the trial judge finds that:

(1) the witness is qualified as an expert by knowledge, skill, experience, training, or education;
(2) the evidence is relevant;
(3) the expert's opinion is based on information reasonably relied upon by experts in the particular field;
(4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and
(5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[8]

The burden of establishing that the expert testimony is admissible lies with its proponent by a preponderance of the evidence.[9] "A strong preference exists"

---

[4] *Smack-Dixon v. Walmart Inc.*, 2021 WL 3012056 (Del. Super. Ct. Jul. 16, 2021) (citing *Bowen*, 906 A.2d at 794).
[5] D.R.E. 702; *see also Smack-Dixon*, 2021 WL 3012056 (Del. Super. 2021).
[6] *Daubert*, 508 U.S. at 597.
[7] *Smack-Dixon*, 2021 WL 3012056 at *2 (citing *Bowen*, 906 A.2d at 795)).
[8] *Id.*
[9] *Id.*

for admitting expert opinions "when they will assist the trier of fact in understanding the relevant facts or the evidence."[10]

Reliable expert testimony is premised on scientific or specialized knowledge which requires the testimony to be grounded in scientific methods and procedures and "supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known."[11]

Many scientific, technical, or specialized fields are not subject to peer review and publication which is why the test of reliability is "flexible." A rigid application of the *Daubert* factors to determine testimonial reliability in every field of expertise is not practical.[12] Even with all the advances of medical science, the practice of medicine remains an art, and a diagnosis in the practice of clinical medicine "is not an exact science."[13]

---

[10] *Smack-Dixon*, 2021 WL 3012056 at * 2 (quoting *Delaware ex. Rel. French v. Card Compliant, LLC*, 2018 WL 4151288, *2 (Del. Super. Ct. Aug. 29, 2018) (quoting *Norman v. All About Women, P.A.*, 193 A.2d 726, 730 (Del. 2018)).

[11] *Daubert*, 509 U.S. at 590.

[12] *Henlopen Hotel v. United Nat'l Ins. Co.*, 2020 WL 233333, at *3 (Del. Super. May 11, 2022).

[13] *State v. McMullen*, 900 A.2d 105, 114 (Del. Super. Ct. 2006). *See also Moore v. Ashland Chem.*, 126 F.3d 679, 688-690 (5th Cir. 1997), *vacated on reh'g en banc*, 151 F.3d 269 (5th Cir. 1998) ("First, the goals of the disciplines of clinical medicine and hard Newtonian science are different. . . .Second, the subject matter and conditions of study are different. . . .Finally, clinical medicine and hard science have marked different methodologies. . . .In sum, hard Newtonian scientific knowledge. . .is knowledge of a particular and limited kind. . . . Although clinical medicine utilizes parts of some hard sciences, clinical medicine and many of its subsidiary fields are not hard sciences. . . . Consequently, the *Daubert* factors, which are hard scientific methods selected from the body of hard scientific knowledge and methodology generally are not appropriate for use in assessing the relevance and reliability of clinical medical testimony"). The Fifth Circuit's discussion of the significant differences between disciplines in "hard science" and clinical medicine still holds true even though the decision in that case was ultimately vacated. *Id.*

4

Again, a gatekeeping judge has "broad latitude" to determine whether an expert's proffered opinion is based upon the "proper factual foundation and sound methodology."[14] This "proper factual foundation" language has been distilled from Delaware Rule 702.[15] To meet the criterion for a "proper factual foundation," an expert's opinion must be based on "facts" and not "suppositions."[16] When applied to a medical expert, a causation opinion is admissible when it's "based on his analysis of the circumstances . . . not mere speculation over the cause."[17] And a proponent need only show by a preponderance of the evidence that her expert's opinions are reliable, not that they are correct.[18] So, this Court's Rule 702 reliability examination must focus on principles and methodology not on the resultant conclusions.[19]

Delaware courts generally recognize that challenges to the "factual basis of an expert opinion go to the credibility of the testimony, not the admissibility, and it is for the opposing party to challenge. . . the expert opinion on cross-examination."[20] "The different depth with which [an expert] pursued particular

---

[14] *Russum v. IPM Dev. P'ship LLC*, 2015 WL 2438599, at *2 (Del. Super. May 21, 2015).

[15] *Id.*

[16] *Id.* at 3.

[17] *Norman*, 193 A.2d at 732.

[18] *McMullen*, 900 A.2d at 114 (citing *In Re: Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

[19] *Henlopen Hotel*, 2020 WL 233333, at *2 ("At bottom, the Court's examination of an expert's opinion must be solely focused on principles and methodology, not on the conclusions they generate.") (quoting *Tumlinson v. Advanced Micro Devices*, 81 A.3d 1264, 1269 (Del. 2013)).

[20] *Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010). *See also Hodel v. Ikeda*, 2013 WL 226937, at *4 (Del. Super. Ct. Jan. 18, 2013); *Daubert*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (internal citations omitted)); *Russum*, 2015 WL 2438599, at *3.

lines of investigation and the different assumptions they made are readily subject to cross-examination and to evaluation by the fact finder for credibility and weight."[21] An expert's testimony will only be excluded in the narrow circumstance where he is shown to have completely neglected the core facts of the case.[22] And, under Delaware Rule 702, a medical doctor's opinion "based on his own knowledge" and informed by his review of a patient's records may certainly be sufficient to clear the *Daubert/Bowen* reliability threshold.[23]

## COMMON ARGUMENTS TO DEFENDANTS' EXPERTS

Defendants filed seven motions to limit the opinions of Plaintiffs' experts. There are two common arguments made as to each expert. First, Defendants object to any opinion that addresses the Defendants' state of mind. Second, Defendants object to any expert rendering an opinion that goes to the ultimate issue for the jury's consideration.

Expert opinions on state of mind are not permitted.[24] However, an expert may testify as to facts contained in the evidence from which the jury can infer a

---

[21] *Henlopen Hotel*, 2020 WL 233333, at *4; *Perry v. Berkley*, 996 A.2d at 1271 (noting cross-examination rather than exclusion can be the proper method of exploring the bases of an expert's opinion and the weight to be ascribed thereto).

[22] *Russum*, 2015 WL 2438599, at *3.

[23] *See e.g.*, *Norman*, 193 A.3d at 731-32.

[24] *See Kaur v. Boston Sci. Corp.*, 2022 WL 1486178, at *4 ("[T]his Court will not permit the experts to offer their opinions about [defendant's] state of mind."); *Ferrari v. Helsman Mgmt. Servs., LLC*, 2020 WL 3429988, at *1 ("State of mind is not appropriate for expert opinion."); *Carter v. Principle*, 2019 WL 193183, at *2 (Del. Super. Jan. 15, 2019), *rev'd on other grounds*, 223 A.3d 428 (Del. 2019) ("[E]xpert opinion as to a defendant's state of mind is not only unnecessary, but inadmissible.)

state of mind on the part of the Defendants.[25]  The parties should follow these guideposts in their examinations.

Judge Stokes had an opportunity in *Patrick Black v. Chromascape, Inc., LLC, et al.* to address Defendants' argument regarding expert testimony on the ultimate issue:

> D.R.E. 704, which was modeled after the Federal Rule, states, in its entirety, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." "Although D.R.E. 704 allows opinions on ultimate issues '[t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions.'"  The expert's testimony must assist the trier of fact.  Further, if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, the testimony will be excluded.
>
> To be sure, "the line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright." Facing this issue, the Sixth Circuit concluded that "[t]he best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate."  In *Charlette A. Karns, et al. v. Emerson Electric Co.*, the Tenth Circuit discussed the line between an inadmissible legal conclusion and admissible assistance in the context of an expert opinion that was analogous to Eckhardt's opinion in the present case.
>
> In *Karns*, the Plaintiff, a thirteen-year-old boy, was cleaning up an overgrown yard by picking up trash while his uncle was operating a weed-trimming and brush-cutting device.  The Plaintiff had bent down to pick up some debris approximately eight feet behind

---

[25] *See Carter*, 2019 WL 193138, at *2 (holding the jury can draw reasonable inferences from the expert testimony to determine if punitive damages were warranted).

his uncle when the blade of the device struck something near the ground, which caused the device to swing violently around, cutting off the Plaintiff's right arm. At trial, judgment was entered in favor of the Plaintiff and the Defendant appealed. On appeal, the Defendant argued that the trial court erred in permitting the Plaintiff's expert to testify that the Defendant acted recklessly.

To begin its analysis, the Tenth Circuit explained that although Rule 704 allows experts to render an opinion that embraces the ultimate issue, "[o]pinions embracing legal standards may, however, be excluded for reasons, such as the likelihood of jury confusion, the danger of unfair prejudice, or the inability of such evidence to assist the trier of fact." Upholding the decision of the trial court, the Tenth Circuit noted that, given the technical, complex nature of the device at issue, expert testimony would be expected to assist the trier of fact. Also, the legal term, reckless, was not "so complex or shaded with subtle meaning as to be beyond the understanding of the average person." Accordingly, the Tenth Circuit found that the expert's testimony did not invade the province of the jury.

The basic necessities of expert testimony are relevance and reliability. Eckhardt's Supplemental Report is both relevant and reliable. It is relevant because it will assist the trier of fact, and it is reliable because it discusses matters beyond common knowledge. Further, the phrases "conscious indifference to the safety of others" and "wanton disregard for safety" do not have a separate, distinct and specialized meaning in the law different from that in present vernacular. These phrases are well within the understanding of the average person. Accordingly, the Court concludes that since Eckhardt's Supplemental Report is "otherwise admissible," striking it would be inappropriate.[26]

I agree with Judge Stokes and will follow his guidance in this case. Whether a particular question falls within the parameters of Judge Stokes' opinion will have to be addressed at trial and will depend on the question asked and its context. In

---

[26] 2016 WL 4217756, at *3-4 (Del. Super. Aug. 9, 2016) (internal citations omitted).

assessing any question, the Court will be mindful of whether the question calls for the witness to talk about Defendants' state of mind and whether the wording of the question is inflammatory.

## TESTIMONY OF PETER J. MYERS

Peter J. Myers ("Myers") is an industrial design expert who has been identified as an expert by the Plaintiff. Myers will opine that in developing the RnP Defendants failed to adhere to well established industry standards and practice around its product development. Defendants' sole issues with Myers are the two common arguments, state of mind and ultimate issue, which the Court has already addressed. The parties should follow these guideposts.

## TESTMONY OF DAVID RONDINONE

David Rondinone ("Rondinone") is a mechanical engineer whom Plaintiffs will call to opine generally on the alleged design defect of the RnP.

Rondinone offers five opinions: (1) the product's inclined angle of approximately 30 degrees was inconsistent with the knowledge and best practices from the scientific community and regulatory agencies; (2) the use of the polypropylene plastic insert was a design defect because it could deform ("creep") inward, creating a narrower and arguably less flat surface for an infant to safely sleep in over time; (3) a proper risk assessment was not performed, but had one been performed, Fisher-Price would have changed the design of the product; (4)

9

the American Society for Testing and Materials ("ASTM") F3118 standard for inclined sleep products was created only to provide approval for the RnP and should never have been written; and (5) the RnP was allegedly dangerous and defective due to the product's incline, the deformable plastic insert, and a restraint system that Fisher-Price supposedly "knew would not be used."[27]  Defendants maintain that Rondinone's opinions should be excluded for the following three reasons.[28]

First, Rondinone's opinion that the approximately 30-degree-angle of the RnP was unsafe is unsupported by any scientific literature.

Second, Rondinone's opinion regarding the polypropylene plastic insert "creep" is both unreliable and unhelpful to the trier of fact.  He never examined the RnP at issue in this case, does not know the condition of the plastic insert in that RnP at the time of the incident, and has no information about the condition of the plastic insert in the subject RnP product.

Third, Rondinone's opinion regarding what might have happened had a hypothetical risk assessment been performed has a factually incorrect predicate and, in any event, is speculative because Rondinone never performed any such risk assessment related to the design and development of the RnP.

---

[27] Docket Item ("D.I.") 302, Exhibit ("Ex.") A. p.18-19.
[28] *Id.* p.2-3.

## 30-Degree Angle

In his report Rondinone states that "design inspiration for the RnP angle was taken from the angle of car seats," however, the American Academy of Pediatrics has warned that "'sitting devices, such as car safety seats … are not recommended for routine sleep' and 'in fact who are younger than 4 months are particularly at risk.'"[29]  In support of this position, Rondinone cites to SIDS and Other Sleep-Related Infant Deaths: Evidence base for 2016 Updated Recommendation for a Safe Infant Sleeping Environment by Rachel Y. Moon of the Task Force on Sudden Infant Death Syndrome.  Additionally, Rondinone relied in part on European Standard EN 12790.[30]  Each of these sources are authoritative and properly relied upon by Rondinone as a basis for his opinion.  Rondinone has relied in part on scientific literature.  Whether his reliance on these authorities was reasonable or appropriate is a matter for cross-examination.

## Plastic Creep Opinions

Rondinone opines that the material chosen by Defendants for the plastic insert in the RnP is polypropylene.  It is a material known to exhibit a behavior known as creep which is the tendency for the material to experience permanent deformation over time under constant stress.  This deformation of the plastic

---

[29] D.I. 302, Ex. A. p.3.
[30] *Id.* p.4.

results in the plastic bending and curving beyond what the design was intended by Defendants and results in a dangerously narrow and less flat surface. Rondinone bases this opinion on Defendants' own internal findings as well as his own scientific measurements and calculations. With respect to Defendants' own internal documents, Rondinone references observations made by one of Defendants' engineers, Margo Moulin. As to Rondinone's own measurements of the RnP models he tested, Rondinone wrote:

> This behavior affects the Rock 'n Play by creating a narrower and arguably even less flat surface for the baby to sleep in safely over time. The two side walls of the insert would be deformed closer together so that the U-shape became tighter over time, compressing the space a baby would occupy.[31]

Defendants take issue with how Rondinone conducted his measurements and under what conditions they were conducted. This goes to the weight of the opinion and not its admissibility. Defendants contend that Rondinone never examined the RnP at issue and, therefore, he should not be permitted to testify about it. It is undisputed that the instant RnP was discarded and not available for inspection. This fact alone, when Rondinone was able to test similar RnPs, does not make his opinions excludable. This subject can also be cross-examined.

---

[31] *Id.* p.8.

Defendants' reliance on *Perry v. Berkley*[32] is misplaced. *Perry* involved the exclusion of an expert medical doctor where the testifying doctor was completely unaware of the Plaintiff's prior medical history. In the instant case, Rondinone has demonstrated that he understands the underlying facts. It is the purpose of cross examination to determine if those facts are incorrect or if his opinions are based on a lack of information. If that is the case, it does not make the testimony subject to complete exclusion.

### Risk Assessment

Defendants take issue with Rondinone's opinion that Defendants did not perform a risk assessment related to the RnP and that had they done so they would never have sold the product. Defendants maintain that this opinion is mere conjecture. The Court agrees. Rondinone never did a risk assessment on the product, therefore, any conclusion he draws is conjecture. Moreover, the testimony is really an attempt to offer an opinion on Defendants' state of mind which is improper. This opinion is excluded.

### TESTIMONY OF IAN NOY

Ian Noy ("Noy") is an industrial engineer in the field of human factors, with a focus on consumer products and warnings. He is Plaintiffs' warning expert. He opines that the deficiencies in the warning system rendered the RnP defective and

---

[32] 996 A.2d 1262 (Del. 2010).

unreasonably dangerous as Defendants did not appropriately warn of the risk of positional asphyxiation.[33] Noy further notes the use of restraints may have had little or no benefit in preventing positional asphyxiation in children who had not ended up out of position.[34] Defendants seek to exclude certain of Noy's opinions.

First, Defendants seek to bar Noy from offering any medical causation opinion.[35] The Plaintiffs agree that Noy cannot offer such an opinion.[36] The Court agrees with Defendants. However, Noy may testify that an infant can asphyxiate in an inclined sleeper since this testimony is fundamental to his opinion that the warnings did not accurately warn of positional asphyxiation. However, as a condition of this testimony, Plaintiffs must produce a qualified expert who can testify that an infant can asphyxiate in an inclined sleeper before Noy can give his opinion. What Noy cannot do is testify A.B. was injured or died from positional asphyxiation. He may not testify that A.B.'s death is consistent with a death caused by mechanical asphyxiation nor that "in all likelihood" that is what happened here.

Defendants next maintain that Noy should be precluded from rendering biomechanical opinions as that falls outside of his expertise.[37] Plaintiffs agree that

---

[33] D.I. 301, Ex. D, Noy Expert Report, p.5.
[34] *Id.* Ex. D. p35.
[35] *Id.* p.6-8.
[36] D.I. 356 p.6-7.
[37] D.I. 301 p.8-10.

14

he cannot give biomechanical opinions.[38]  However, Noy can opine that positional asphyxiation is a risk in using the product.  This is a factual premise for his opinion that the RnP was defective because it did not appropriately warn of positional asphyxiation risk and the use of restraints may have had little or no benefit in preventing positional asphyxiation in children who had not ended up out of position.  Again, before this testimony can be offered, Plaintiffs must produce qualified expert testimony that positional asphyxiation is a risk in using the product.

Defendants seek to exclude Noy from offering an opinion that "[n]on-use of the restraint was a known, foreseeable and evidently accepted manner of use and that Ms. Brown used the RnP in a manner that was reasonable and foreseeable."[39]  According to Defendants, to allow this opinion would allow Noy to draw a legal conclusion by applying the law to the facts.  I agree with the Defendants.  As pointed out by the Plaintiffs, Noy's view on this issue is informed by the testimony of Kitty Pilarz, the Vice President of Product Safety and Regulatory Compliance.[40]  Plaintiffs can simply question Pilarz on this point to establish the predicate necessary to argue the point to the jury.  To do it through Noy, who admits that he did not employ a method in this case to determine whether

---

[38] D.I. 356 p.7-10.
[39] D.I. 301 p.12-14.
[40] D.I. 356 p.11.

15

a consumer's behavior with respect to the product use is foreseeable, is impermissible.

## TESTIMONY OF WILLIAM KITZE

Defendants have moved *in limine* to limit the testimony of William Kitzes ("Kitzes"). Kitzes is a liability expert who will offer the following 8 opinions:

1. **Failure to Warn**: Fisher-Price failed to warn about the risk of injury and death from foreseeable use, including the dangers of prolonged overnight sleep and leaving children unattended.

2. **Inadequate Risk Assessment:** Fisher-Price failed to identify hazard such as a suffocation and positional asphyxia and did not implement effective risk-reduction measures.

3. **Promotion Contrary to Best Practices**: Fisher-Price promoted the Sleeper for overnight use despite opposition from regulatory bodies and lacking independent research supporting the safety of the inclined design.

4. **Creation of an Unreasonably Dangerous Product**: Promoting overnight use contributed to infant deaths, creating an unreasonably dangerous condition.

5. **Misleading Packaging and Labeling**: Packaging misled consumers about safety for older infants, and critical warnings about overnight sleep were removed.

6. **Failure to Timely Report to CPSC**: Despite internal awareness of incidents, Fisher-Price delayed reporting hazards to the CPSC.

7. **Creation of a Substantial Product Hazard**: The Sleeper constituted a substantial hazard due to defect patterns, market presence and the severity of risks.

16

8. **Conscious Disregard for Safety**: Fisher-Price disregarded repeated death reports and delayed recalls, demonstrating conscious and reckless disregard for infant safety.[41]

Defendants move to preclude Kitzes from offering any medical causation opinion.[42] Plaintiffs respond that Kitzes will not offer any medical causation, no doubt in part, because Kitzes is not qualified to offer such an opinion.[43] Kitzes may not offer a medical causation opinion.

Defendants take issue with certain of Kitzes' opinions maintaining that some of them are not supported by any discernible rationale or methodology. Defendants first challenge Kitzes' failure to warn opinions.[44] In opinion 1, Kitzes opines that Defendants failed to warn consumers (i) about the catastrophic risk of injury and death associated with the foreseeable use of the RnP, (ii) that the product was not safe for the prolonged overnight period of sleep and (iii) that parents should "never leave child unattended."[45] Opinion 5 also speaks to the products warnings and its various revisions.[46] The argument is that these opinions lack a reliable methodology.

Defendants are incorrect that Kitzes lacked a reliable methodology. Kitzes' opinions are grounded in his expertise in safety management and his application

---

[41] D.I. 353 p.7-8 (citing Ex. B, Kitzes Expert Report).
[42] D.I. 310 p.7-9.
[43] D.I. 353 p.10.
[44] D.I. 310 p.10.
[45] *Id.* Ex. A, Kitzes Expert Report, p.8 ¶1.
[46] *Id.* Ex. A p.9 ¶5.

17

of ANSI Z535.4, which sets recognized guidelines for product safety warnings.[47] Kitzes concluded that, despite the product's labels being titled with "warning," they did not meet the definition of a warning under ANSI Z535.4. He also did not find that the revised labels complied with the standard. He systematically compared Defendants' warnings to ANSI standards, which require clear hazard identification, severity statements, and instructions to avoid harm. He analyzed the language and clarity of the warnings in light of industry standards and best practices for risk communication. He also evaluated how Defendants' post-sale monitoring and revisions addressed – or failed to address – known hazards.[48] That Defendants disagree with his conclusions is not a basis to exclude them but to be explored on cross-examining.

Defendants' reliance on *Ruggiero v. Yamaha Motor Corp*[49] is misplaced and does not support preclusion here. In *Ruggiero*, the Third Circuit excluded Kitzes' opinion for merely referencing ANSI standards without explaining how the existing warnings were deficient. The court found his conclusions in that case speculative and unhelpful to the trier of fact.[50] In the instant case, unlike in *Ruggiero*, Kitzes' opinions and testimony plainly explain how Defendants' warnings miscommunicated or omitted risks – especially concerning prolonged

---

[47] *See* Ex. A. p.71-72; Ex. D.
[48] D.I. 353 p.15.
[49] 778 F.App'x 88 (3d Cir. 2019).
[50] *Id.* at 93.

overnight sleep. He detailed how the warnings violated ANSI principles by failing to clearly identify hazards and severity levels, leaving consumers uninformed about foreseeable risks.

Defendants next challenge Kitzes' opinion that Defendants did not perform an adequate risk assessment and failed to apply adequate risk reduction measures.[51] According to Defendants, Kitzes merely makes the conclusory statement without in any manner indicating why or how, which runs afoul of the teaching in *Kimberly Landis, et al. v Hearthmark, et al., LLC*.[52]

While *Landis* did exclude some conclusory opinions, it explicitly permitted Kitzes' testimony regarding general risk assessment processes, recognizing that such testimony was admissible to explain standard procedures and methodologies.[53] That is what Kitzes intends to offer in this case. His opinion is grounded in a five-step framework for evaluating product safety management: (1) determining if a written safety policy existed, (2) identifying foreseeable hazards, (3) conducting risk assessments, (4) implementing mitigation strategies, and (5) monitoring post-sale incidents and adjusting protocols.[54]

As to the first step, Kitzes concluded Fisher-Price lacked a meaningful safety policy and offered no concrete guidance for identifying hazards or assigning

---

[51] D.I. 310 p14-16.
[52] 2014 WL 199261 (N.D. W.Va. 2014).
[53] 2014 WL 199261, at *6.
[54] D.I. 353 p.17-18.

responsibilities. Kitzes testified that what Fisher-Price referred to as safety policies were merely procedures used to make changes, without documented rationale for those changes. The "Closed Loop Quality Assurance Process" similarly had "no teeth," providing no guidance on implementation or application. Fisher-Price outlined broad commitments but failed to take action based on its written policies. Their purported safety protocols consisted of "platitudes without substance," offering no direction to employees on how to identify or assess risk.[55]

Kitzes evaluated Fisher-Price's conduct based on the well-established evidence, including the product design decisions, incident reports, and Fisher-Price's responses to known hazards. Kitzes' focus on actual practices, rather than mere documentation alone, reflects a valid and experience-based approach.

## TESTIMONY OF ROBERT BARDWELL

Robert Bardwell ("Bardwell") has worked in the field of statistical analysis and consulting since completing his PHD in mathematics in 1989. He is being offered as an expert witness by Plaintiffs. Bardwell is offering statistical opinions about the rates of death associated with the RnP as compared to other established safe sleep products. Based on the statistical rate of death associated with the RnP Bardwell has concluded that the fatality risk while supine in a RnP with no risk factors was 913 times that of supine death in a crib; the fatality risk while prone in

---

[55] *Id.* p.18 (citing Ex. D. 82:12-83:4; 85:10-19).

a RnP with no risk factors was 24 times greater than the risk of prone death in a crib; and the overall fatality risk of a RnP was 24 times greater than the risk of death in a crib. Bardwell concluded that these rates were of such statistical significance that it was virtually statistically impossible that they were the result of chance.[56] Bardwell performed this analysis using fatality data from the CDC as well as reports directly from Fisher Price.[57]

Bardwell is not offering a specific causation opinion in this case, and he may not offer a specific medical causation opinion because he is not qualified to do so. Defendants' request that Bardwell be prevented from offering an opinion on the specific causation is granted. The question is whether Bardwell can offer testimony on general causation based on a statistical approach.

To establish general causation, a plaintiff frequently utilizes testimony by experts discussing epidemiological studies that examine incidence rates in exposed populations compared to unexposed control groups.[58] As a general matter under *Daubert*, "[e]pidemiologic studies have been well received by courts trying mass tort suits. Well-conducted studies are uniformly admitted. The widespread

---

[56] D.I. 362 p.2-3, Ex. C, Bardwell Expert Report; p. 5-6.

[57] *Id.*, Ex. C. p.17-21.

[58] *See, e.g., In re Asbestos Litig.,* 911 A.2d 1176, 1206 (Del. Super. 2006); *In re Viagra Prods Liab. Litig.,* 572 F.Supp 2d 1071, 1078 (D. Minn. 2008); *Merrell Dow Pharm's., Inc. v. Havner,* 953 S.W.2d 706, 714-18 (Tex. 1997).

acceptance of epidemiology is based in large part on the belief that the general techniques are valid."[59]

One approach for assessing an association in epidemiologic research is the rate of "relative risk" ("RR"), which is determined by comparing the incidence rate of persons exposed to a product or chemical agent with the incidence rate of those not exposed.[60] The relative risk approach calculates a risk of injury in a population exposed to the product or chemical agent, as compared to a control group, and calculates whether the difference is statistically significant and/or attributable to chance. Relative risk is a well-established method of measuring the strength of a causal relationship between an allegedly dangerous agent and a particular harm.[61] "The higher the relative risk, the greater chance that a relationship is causal."[62] Furthermore, methodological approaches for assessing risk that have been published in peer reviewed journals will be treated as more reliable under *Daubert*.

Dr. Bardwell utilized a reliable epidemiological analysis by examining the relative risk of RnP compared to a control population to establish general causation, a method that is deemed reliable and admissible in complex products

---

[59] *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 289 F.Supp.2d 1230, 1239 (W.D. Wash. 2003) (citing David L. Faigman, et al. eds., 2 Modern Scientific Evidence: The Law and Sci. of Expert Testimony §28-1.1, at 302-03 (1997)).

[60] *In re Viagra Prods. Liab. Litig.,* 572 F.Supp.2d at 1078.

[61] *Pritchard v. Dow Agro Si's,* 705 F.Supp.2d 471, 485 (W.D. Pa. 2010) (citing Fed. J. Ctr., Reference Manual on Sci. Evid., Reference Guide on Epidemiology, at 335-36 (2d ed. 2000), *aff'd*, 430 F. App'x 102 (3d Cir. 2011)).

[62] *Id.*

reliability cases for this purpose under *Daubert*.[63]  Dr. Bardwell's methodology on this exact subject was published in a peer reviewed journal, which is one of the "principal ways of demonstrating reliability."[64]

In addition to Bardwell, there is another expert in this case who utilizes the same methodology for the same analysis.  That expert is Dr. Shahrokh Rouhani who has been retained by Defendants to offer testimony similar to Bardwell.  Expectantly, Rouhani reaches a different conclusion than Bardwell.  The point, however, is the existence of this type of an expert on both sides of this case demonstrates that general causation can be established in part through statistical analysis of the type conducted by both Bardwell and Rouhani.  As such, I reject Defendant's argument that Bardwell's opinions, and by implication Rouhani's opinions, are not the product of any scientifically valid methodology.  They indeed are.

Defendants maintain that Bardwell's testimony should be further excluded because it relies on Dr. Erin Mannen's opinions.[65]  What Defendants fail to appreciate is that this Court has already ruled that Dr. Mannen's findings are

---

[63] *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 289 F.Supp.2d at 1239 (citing Faigman, et al. eds., 2 Modern Scientific Evidence: The Law and Sci. of Expert Testimony § 28-1.1, at 302-03); *In re Viagra Prods. Liab. Litig.* 572 F.Supp.2d at 1078; *Pritchard v. Dow Agro Sci's,* 705 F.Supp.2d at 485 (citing Fed. J. Ctr., Reference Manual on Sci. Evid. Reference Guide on Epidemiology, at 335-36).
[64] *See* Ex. D., Robert Bardwell, Laura Sangaré, et al., *The Risk of Sleep-Related Death in an Inclined Sleep Environment*, 24 BMC, Pub, Health, 2186 (2024); *In re Asbestos Litig.,* 2016 WL 10703199, at *2 (Del. Super. June 8, 2016) (quoting *Daubert II*, 43 F.3d at 1315).
[65] D.I. 300 p.11-12.

reliable.[66]   Based on the prior summary judgment decision in this case, I reject Defendants' argument that the testimony should be excluded as it goes only to increased risk.[67]   Under Pennsylvania law, increased risk testimony is not, in and of itself, sufficient to meet Plaintiffs' causation burden.   As explained at the summary judgment stage, this evidence is only a piece of the puzzle that Plaintiffs tend to rely on to meet their causation argument.

The remaining arguments made by Defendants as to the flaws in Bardwell's analysis go not to the opinion's admissibility but to its weight.[68]   Bardwell will not only be subject to cross examination but Rouhani's testimony will affirmatively rebut Bardwell.   The experts disagree.   That is for the jury to hear not for me to decide on a motion to exclude.

## TESTIMONY OF ROYAL BUNIN

Royal Bunin ("Bunin") is a forensic economist who has been retained by the Plaintiffs to offer expert opinions on future losses.   Defendants have moved to preclude Bunin from providing his three opinions regarding (1) the infant's projected future lost earnings, (2) the infant's projected future lost fringe benefits, and (3) the projected future lost services to Plaintiffs.   According to Defendants, these calculations are sheer speculation, have little to no connection to the record

---

[66] *See* D.I. 320.
[67] *See* D.I. 318.
[68] D.I. 300 p.12-16.

in this case, and, therefore, are unreliable. Moreover, Defendants maintain, that as to the fringe benefit analysis in the context of Plaintiffs' survivor claim there is no clear evidence to suggest the infant would have received such benefits.[69] Plaintiffs counter that when the "factual basis, data, principles, methods or their application in an expert opinion are challenged the Court inquires simply whether the expert's testimony has a reliable basis in the knowledge and experience of the relevant discipline, and, in this case, that has been done.[70]

In *Greer v. Bryant et al.*,[71] the Pennsylvania Superior Court was called upon in a medical malpractice case to determine whether future damages for an infant were appropriate. In *Greer* the Court wrote:

> PCOM argues that the judge improperly allowed expert testimony which used a 1.1% "productivity factor" to calculate the deceased child's potential earning capacity. PCOM claims that since the child was not old enough at her death to exhibit tangible objective factors that would demonstrate the child's earning potential, the expert had no foundation on which to base his 1.1% figure. We disagree.
>
> By now, it is well-settled that in order to determine lost wages vis-a-vis a Plaintiff's potential earning capacity, the use of a productivity factor is proper to estimate a Plaintiff's potential productivity increase. *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980). A "productivity factor" takes into account an individual's ability to influence his rate of income earning power over time by considering objective criteria such as age, maturity, education, and skill. *Id.* at 573, 421 A.2d at 1033. The basis for sanctioning the use of a productivity factor is the progressive

---

[69] D.I. 308 p.1.
[70] D.I. 349 p.4 (citing *M.G. Bancorporation, Inc*, 737 A.2d 513.)
[71] 621 A.2d 999 (Pa. Super. Ct. 1983).

notion that while damages are never capable of precise mathematical computation, the inherently speculative nature of damages should not justify the exclusion of reliable economic theory from the jury's consideration. *Id.* at 574–575, 421 A.2d at 1034. PCOM argues that the Supreme Court's holding in *Kaczkowski* requires a "proper foundation" for the introduction of a productivity factor. Thus, since Rachel was unable to identify any of the objective criteria normally involved in a productivity analysis (*i.e.,* age, maturity, prior work experience, etc.) for her newborn child, no "proper" foundation had been laid for the factor. This argument is specious. We do not read *Kaczkowski*'s proper foundation requirement as one that must be rigidly applied. Rather, *Kaczkowski* is premised on the notion that although every victim is entitled to full compensation, calculation of damages is inherently speculative. Reliance on economic data is helpful in aiding the factfinder and reducing the amount of guesswork that naturally exists when determining damages. Thus, the "proper foundation" for the admission of a productivity factor can only be determined on a case by case basis, taking into account Plaintiff/victim's personal circumstances.

In this case, the economic expert calculated the newborn child's 1.1% productivity factor based on the objective criteria demonstrated by the child's mother. As the trial court noted, in a case where an infant is entitled to uncertain future loss damages, a reasonable basis with which to calculate the factor is with the mother's objective criteria. The only alternative, precluding an infant from proving such damages in the context of a survival action brought by her parents, would ignore the economic reality that that child possessed potential earning capacity. Projecting that child's productivity potential on a plane equal to that of her parent is certainly more "proper" than ignoring that potential altogether. The trial judge did not abuse his discretion in allowing the economic expert to apply a productivity factor based on the deceased child's mother's experiences.

The teaching of *Greer* is that while projecting future damages for infants involves "guesswork" such an exercise is appropriate for the jury to consider if it

26

is based on economic data and takes into account the plaintiff/victim's personal circumstance. In the instant case, Bunin based his calculations on the education and work history of the infant's parents. In his report Bunin writes:

> Ms. Brown is currently 31.9 years of age having been born on 4/5/91. Following her graduation from the Academy Park High School in 2009, Ms. Brown obtained her Bachelor of Arts degree in Psychology from Rosemont College in 2013 and recently obtained her commercial drivers license ("CDL"). She noted in her deposition, prior to the birth of her son, she worked for TSA from 2011 until 2014. Following his death, Ms. Brown was employed as an events coordinator at the Bellevue State Park in Delaware. Prior to obtaining her current position as a bus driver with District Five, Ms. Brown worked at the YMCA in Delaware and then at the YMCA in South Carolina.

> Mr. Braggs is currently 36.7 years of age having been born on 7/14/86. Following his high school graduation in 2004, Mr. Braggs indicated in his deposition he attended the Montgomery County Community College, the Philadelphia County Community College, and Strayer University. He began working for Comcast in 2019, Mr. Braggs has functioned as an analyst with Comcast Business.[72]

Additionally, Bunin relied upon certain labor department statistical data which is a standard source of date utilized by economic experts[73] Bunin's reliance on this material is sufficient to allow his future loss projections to reach the jury. The fact that Bunin included calculations beyond a bachelor's degree is a matter for cross examination not exclusion. The same is true regarding the argument that Bunin did not consider the health history of the infant since Plaintiffs have

---

[72] D.I. 308, Ex. A, Bunin Expert Report, p.2.
[73] *Gilda Mecca, et al. v. Frank Lukasik, et al.,* 530 A 2d 1334, 1339 (Pa. Super. Ct. 1987).

proffered that there will be testimony from the doctors that the infant, notwithstanding his health issues, would be expected to live to a normal life expectancy. For these same reasons, Bunin's testimony regarding his projection of future fringe benefits is admissible and subject to cross examination. Finally, the criticisms of the Defendants as to Bunin's testimony regarding loss services goes to the credibility of the issue not its exclusion.[74]

## TESTIMONY OF MARRIETTA S. ROBINSON

Defendants seek exclusion or limitation of Plaintiffs' CPSC and ASTM expert, Marietta S. Robinson ("Robinson"). Defendants rely on three primary grounds. First, Defendants argue Ms. Robinson's testimony is improper because (1) it includes legal conclusions and opinions on the law; (2) inappropriately testifies to Defendants' mental state, intention, and motivation; and (3) provides a narrative retelling of the cases' events.[75] Second, Defendants contend Robinson's expertise blocks her from testifying to the design process of and safety measures taken in the production of the RnP.[76] Finally, Defendants assert Robinson's testimony pertaining to the scope of CPSC's authority is irrelevant.[77]

---

[74] The Court is not at all clear that the result under Delaware law would be the same. It is this Court's view that Pennsylvania law on this topic is far more lenient in allowing it to pass through this gatekeeping function and getting the evidence before the jury than would be the case under Delaware law.
[75] D.I. 303 p.2-3.
[76] *Id.* p.3.
[77] *Id.*

Plaintiffs reject each contention. As to expressing improper legal opinions, Plaintiffs argue Robinson's testimony will not give the jury an ultimate opinion but rather will provide expert information and a factual basis to "lead" jurors to a legal conclusion.[78] Plaintiffs further deny the claim that Robinson testifies to Defendants' state of mind and that her testimony is narrative.[79] Next, Plaintiffs assert Robinson is not exceeding her expertise by opining on the design process and safeguards in producing the RnP as they relate to her expert understanding of the CPSC and ASTM.[80] Finally, Plaintiffs argue Robinson, in her expert capacity, may testify as to the scope of CPSC's statutory authority.[81]

**Common Arguments**

Defendants raise concern over Robinson's use of the phrases "wrongful conduct," "egregious wrongful conduct," "outrageous conduct," and "intentional, willful and wanton disregard."[82] Considering the case law cited in the common arguments section, these words and phrases are not so intertwined with their legal meanings that they would be distinguishable from their everyday meaning to a lay person. However, I again caution that the Court will be mindful of not allowing state of mind testimony and the use of inflammatory words.

---

[78] D.I. 355 p.7-9, 10 n.3, 11-14.
[79] *Id.* p.14-20.
[80] *Id.* p.20-22.
[81] *Id.* p.23.
[82] D.I. 303 p.10 (citing Exs. A at 2; B at 1, 11, 20).

Defendants also pose a problem with Robinson's testimony on Defendants' legal duties as well as the adequacy of the RnP's warning labels.[83] Plaintiffs maintain that Robinson will only testify to statutory provisions imposed on manufacturers, such as Defendants, by the CPSC as well as the extent to which the CPSC and ASTM consider adequate warning labels in determining the safety of a product.[84] In her capacity as an expert on the CPSC and ASTM, Robinson may testify to relevant Consumer Product Safety Improvement Act ("CPSIA") provisions that apply to Defendants as well as how the CPSC considers proper warnings in their evaluation of product safety.

Defendants contend Robinson's testimony suggests three states of mind: (1) Defendants "manipulated" their voluntary regulatory process to be advantageous to themselves; (2) Defendants were motivated by "profits over safety;" and (3) a communication between Fisher-Price's attorney and the CPSC suggests Defendants "threatened CPSC with a lawsuit."[85] When testifying to each circumstance, Ms. Robinson may comment on facts that are relevant to her understanding of CPSC and ASTM product safety requirements. However, Ms. Robinson may *not* suggest Defendants acted with a certain state of mind. That is something the jurors must decides for themselves. In addition, the communication

---

[83] *Id.* p. 11.
[84] D.I. 355 p.10-13.
[85] D.I. 303 p.14-15.

between Fisher-Price's attorney and the CPSC occurred in April 2019, after the incident; therefore, it is irrelevant, and the Court will not allow the jury to hear testimony on it otherwise.

**Narrative Testimony**

It is impermissible for an expert to "narrate internal documents and form a conclusion evident to a lay person from their face."[86]  Defendants argue this is exactly what Ms. Robinson has done in her expert report.[87]  However, an expert report may include "narratives of . . . documents" as long as they are admissible and the expert is using them to create their opinions.[88]

The District Court of Minnesota recently assessed Robinson's CPSC expertise as it pertains to defective engines in *Reynolds v. Polaris*.[89] The defendant raised a similar argument seeking to reject Robinson's testimony on the grounds it "is merely a chronology."[90]  The Court expressed concern with Robinson's report "read[ing] like a book" but emphasized that the report "notif[ies] the opposing party of the expert's opinion(s) and the facts informing the opinion(s)" and is not provided to a jury.[91]

---

[86] *Allscripts Healthcare, LLC v. Andor Health, LLC*, 2022 WL 3021560, at *42 (D. Del. 2022).
[87] D.I. 303 p.16-18.
[88] *Kaur*, 2022 WL 1486178, at *3.
[89] No. 27-CV-22-12627 (Dist. Minn. June 28, 2024).
[90] *Id.* at *3.
[91] *Id.* at *3-4.

The Court agrees with the holding in *Reynolds* and finds that Robinson's testimony will not be excluded on the basis that her report is in narrative form. Robinson may use relevant facts and admissible evidence to form her opinions when asked proper questions that do not call for narrative answers. If Robinson's testimony at trial becomes a narrative re-telling of events that is irrelevant to her expert opinions, Defendants have the right to object at that time.

**Limiting Testimony to Subject Matter Expertise**

Plaintiffs maintain Robinson's testimony will be limited to "whether [Defendant's] design process and procedures complied with [CPSC and ASTM manufacturer] standards."[92] Plaintiffs agree that Robinson will not be expressing opinion on feasibility of alternative designs and the product's defectiveness nor any other opinion that requires engineering, medical, or product design backgrounds. Those opinions are excluded.

In response to the defendant's subject matter argument against Robinson's testimony, the *Reynolds* court held Robinson may rely "upon other experts' input reasonably relied upon in her field and appl[y] her CPSC expertise to reach a conclusion regarding whether the [product] defect(s) constituted a product hazard pursuant to CPSC standards."[93]

---

[92] D.I. 355 p.22.
[93] *Reynolds*, No. 27-CV-22-12627, at *6.

Robinson's testimony is relevant and reliable in that it provides her specific expertise pertaining to CPSC and ASTM standards to assist the jurors in making their own determination of whether the RnP was defective. This Court agrees with *Reynolds'* holding and finds Robinson may testify within the narrow scope of her expertise as to the applicability of CPSC and ASTM standards to Defendants' RnP production.

### Criticisms of CPSC

*Reynolds* held testimony "describ[ing] the limited authority vested in the CPSC" is "both within Robinson's expertise and helpful to the jury."[94] However, the Court also held Robinson may not expand on this topic with criticisms on the scope of CPSC's authority.[95] For the same reason, this Court limits Robinson's testimony to the actual scope of CPSC's authority and not any critiques relating to inadequacy or Congress's role in limiting the CPSC's authority. These criticisms are irrelevant and excluded.

Plaintiffs seek inclusion of Robinson's critique of CPSIA Section 6(b) requiring CPSC to obtain approval from the manufacturer before releasing a public message on a potentially hazardous product.[96] As discussed prior, Robinson may testify to the statute's applicability to Defendants but may not critique the statute.

---

[94] *Id.* at *8.
[95] *Id.*
[96] D.I. 355 p.23.

In addition, the conversation between Fisher-Price's attorney and CPSC Plaintiffs reference in their argument to include testimony on Section 6(b) occurred after the incident and is therefore irrelevant.

To be clear, Plaintiffs may not elicit testimony from Robinson regarding the recalls of the product at issue. Nor may Plaintiffs elicit testimony on events post-accident.

## DEFENDANT'S OTHER MOTIONS

## TESTIMONY OF GARY DEEGEAR

Defendants have moved to exclude Plaintiffs from making any reference to Dr. Gary Deegear's ("Dr. Deegear") medical license and related events. Dr. Deegear is a medical doctor with whom the Defendants consulted during the 2008-2009 time frame. This was during the development process of the product at issue in this case. Dr. Deegear is a medical doctor. He was the only doctor with whom the Defendants consulted during the development of the RnP. In 2016, Dr. Deegear, who was licensed to practice medicine in Texas, had his license cancelled due to non-payment of renewal fees. For the next two years, Dr. Deegear represented himself to patients as a licensed physician and held himself out to be the supervising physician of a medical spa where he worked part-time. On September 21, 2018 the Texas Medical Board found that Dr. Deegear falsely held himself out as a licensed physician and permanently prohibited him from

34

practicing medicine in the State of Texas. The Texas Board's decision reflects that Dr. Deegear did not appear at the Board's hearing.[97]

Defendants seek to exclude any testimony regarding Dr. Deegear's medical license and the events related to that before the Texas Board. Defendants maintain that the testimony is irrelevant, and, even if relevant, its relevance would be unfairly prejudicial and confuse and mislead the jury. Defendants focus on the timing of Dr. Deegear's involvement in the development of the RnP and the Texas Board's actions to argue that the two are remote in time and not relevant.[98] Plaintiffs counter that Dr. Deegear is a central witness in the defense's case, and the issues surrounding Dr. Deegear's license go directly to his credibility.[99]

It is automatic that any party may challenge a witness's credibility.[100] The credibility of a witness is always at issue for the jury's consideration.[101] Dr. Deegear may be asked by Plaintiffs if his medical license was permanently suspended by the Texas Board because he held himself out as a licensed physician when he was not. These specific questions go to credibility and can be asked. Plaintiffs can go no further. However, if Defendants seek to get into the facts

---

[97] *See* D.I. 309 p.1-3; D.I. 357 p.4-5.

[98] D.I. 309 p.3-5.

[99] D.I. 357 p.10-14.

[100] *See* D.R.E. 607 ("Any party, including the party that called the witness, may attack the witness's credibility.")

[101] *See Atkinson v. State*, 778 A.2d 1058, 1062 (Del. 2001) (quoting *Pryor v. State,* 453 A.2d 98, 100 (Del. 1982)) ("'[T]he jury is the sole trier of fact, responsible for determining witness credibility and resolving conflicts in testimony.' As such, '[j]urors should be afforded every opportunity to hear impeachment evidence that may undermine a witness' credibility.'").

surrounding the suspension that will open the door for Plaintiffs to pursue the issue further. How far that door is opened will depend on how Defendants handle this issue.

Defendants' motion on this point is **DENIED**.

## EVIDENCE OR ARGUMENT REGARDING THE CONGRESSIONAL INVESTIGATION ABOUT THE ROCK 'N PLAY SLEEPER

Defendants seek to exclude the following: (1) the United States House of Representatives Committee on Oversight and Reform Staff Report titled, "Infant Deaths in Inclined Sleepers: Fisher-Price's Rock 'n Play Reveals Dangerous Flaws in U.S. Product Safety ("Staff Report"), (2) transcript of the June 7, 2021 hearing before the Committee ("Hearing Transcript"), and (3) statements made, or documents created, in relation to the investigation and hearing (collectively, "Congressional Investigation Materials"), including the fact the investigation occurred.[102] Defendants' primary basis for exclusion is that the evidence is irrelevant and prejudicial because the congressional investigation and subsequent Staff Report occurred post-incident and the purpose of the investigation is unrelated to the instant products liability claims.[103] In their Response, Plaintiffs argue the evidence is relevant because, despite the investigation occurring after the incident, the materials concern events that occurred before the incident, including

---

[102] D.I. 295 p.1.
[103] *Id.* p.2-3.

"initial design, manufacturing, testing, [and] labeling and release of the Rock 'n Play Sleeper."[104]

The Congressional Investigation began in 2019, and the Staff Report was published in June 2021. Both occurred long after A.B.'s death in January 2018. The purpose of the investigation does not align with this Court's role in conducting this jury trial. The Staff Report, the result of the investigation, is an advocacy piece pushing for legislative reform. Evidence admitted in this trial is meant to assist the jury in determining factual issues in order to make an ultimate decision on liability. In addition, there are case-specific facts in this lawsuit that were not considered in the Investigation. Even if relevant, the probative value of the Report is substantially outweighed by its prejudice. In addition, the Report could mislead and/or confuse the jury. For these reasons, the Congressional investigation materials, including the Hearing Transcript and Staff Report, are inadmissible, and this Court **GRANTS** Defendants' Motion.

If Plaintiffs wish to raise information within the Report, Hearing, or other Investigation Materials, they may do so through evidence that is not related to the Investigative Report to the extent the evidence is not otherwise barred.

---

[104] D.I. 359 p.10.

## EVIDENCE AND ARGUMENT REGARDING THE SNUGA INFANT SWING RECALL

Defendants argue raising the Snuga Infant Swing Recall is irrelevant because it is an entirely different product from the RnP.[105]  Plaintiffs do not plan on raising any evidence concerning the Snuga Infant Swing Recall unless Defendants first raise it.[106]  Defendants' Motion is **GRANTED**.

Defendants also seek a ruling on excluding Plaintiffs from raising the recall of any Mattel or Fisher-Price product other than the RnP.[107]  The Court will grant the request.

## EVIDENCE OR ARGUMENT OF POST-INCIDENT ACTIONS BY GOVERNMENT BODIES

Defendants seek exclusion of any action taken by a government body after the incident on January 16, 2018 pertaining to the RnP and any other infant inclined sleeper.[108]  Specifically, Defendants ask the Court to bar Plaintiffs' use of the following, but does not limit their Motion to just these two actions,: (1) the United States Congress' investigation and enactment of the "Safe Sleep for Babies Act of 2021," and (2) the Consumer Product Safety Commission's ("CPSC") Supplement Notice of Proposed Rulemaking in 2019 and subsequent rule impacting a limited number of infant sleep products produced on or after June 23,

---

[105] D.I. 305 p.4.
[106] D.I. 348.
[107] D.I. 305 p.1 n.1.
[108] D.I. 296 p.1.

2022.[109]  Defendants argue steps taken by government entities after the incident, and which do not apply retroactively, are irrelevant to the instant case.[110] Defendants also ask the Court to preclude Plaintiffs' use of the words "banned" or "illegal" when referring to the RnP arguing that at the time of the incident, and before, the RnP was sold legally.[111]

In their Response, Plaintiffs argue the above-mentioned government actions are highly relevant to this case for several reasons.[112]  First, Plaintiffs contend, at least the two investigations named by Defendant, go to the central issue in this case of whether the RnP was a defective product that caused A.B.'s death.[113] Second, Plaintiffs assert the evidence goes to comparative negligence of the parents because both Congress and the CPSC found use of the restraints was immaterial to the RnP's safety.[114]  Third, Plaintiffs argue the evidence is relevant to their biomechanical expert, Dr. Erin Mannen's, credibility because both entities used her in their respective investigations.[115]  Finally, Plaintiffs assert, because Defendants' experts state the CPSC's position on the safety of the RnP in their

---

[109] *Id.*
[110] *Id.* p.2, 5-7.
[111] *Id.* p.11.
[112] D.I. 369 p.1.
[113] *Id.* p.2.
[114] *Id.* p.6.
[115] *Id.* p.7.

reports, Plaintiffs should be able to introduce evidence of CPSC's post-incident investigation and subsequent ruling.[116]

The Court finds Defendants' ask to exclude evidence and argument of government actions taken *after* the incident appropriate. This evidence is irrelevant for two reasons: (1) actions taken after the incident do not aid the jury in understanding what happened leading up to and during the incident, and (2) government investigation and rulemaking pertaining to the safety of incline sleep products does not consider the distinct facts of the instant case, and, therefore, cannot help the jury in making liability determinations for this specific scenario.

The Court also excludes use of the words "illegal" and "banned" in relation to the RnP. The RnP was banned from the market in 2019, *after* the incident in this case.

Based on the above reasons, the Court **GRANTS** Defendants' Motion.

## EVIDENCE OR ARGUMENT ON THE ACTIONS OR COMMUNICATIONS OF FOREIGN GOVERNMENT REGULATORS

Defendants ask the Court to exclude actions taken or communications made by "regulators or entities outside the United States, including but not limited to" Health Canada, the Royal College of Midwives in the United Kingdom, the Queensland Government of Australia, and the Australian Competition and

---

[116] *Id.*

Consumer Commission related to the RnP and inclined infant sleepers in general.[117] Defendants argue regulations made or actions taken towards the RnP in foreign countries are irrelevant to the instant case because a foreign country's regulations and policies are immaterial to Defendants' liability under United States law.[118] Plaintiffs contend actions and communications of foreign countries are admissible as notice to Defendants of potential issues with the RnP.[119] Plaintiffs proffer evidence of regulations from Canada, Australia, and the United Kingdom from as early as 2011.[120]

In *In re Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation*, the District Court allowed the plaintiff "to offer evidence that foreign regulatory agencies raised concerns about acetaminophen dosing years before the decedent's death to show notice and/or knowledge."[121] The Court acknowledged that submitting evidence of how a foreign country handled a product safety issue requires addressing the country's regulatory system. However, that line of questioning is not necessary when using the evidence simply to show the defendant was on notice of potential issues with the product.[122]

---

[117] D.I. 307 p.1.
[118] *Id.* p.1, 6.
[119] D.I. 354 p.2.
[120] *Id.*
[121] 181 F.Supp.3d 278, 307 (E.D. Pa. 2016).
[122] *Id.*

Defendants cite another Eastern District of Pennsylvania case, *Pennsylvania Trust Co. v. Dorel Juvenile Group, Inc* and argue its exclusion of Canadian label requirements applies to this case.[123]   However, *Pennsylvania Trust Co.* is distinguishable from the instant case because the plaintiffs offered evidence of the label on the defendant's Canadian booster seats, differing from the label on the booster seats in the United States, to establish that defendants knew the booster seats in the United States was unsafe.[124]   The Court held this evidence was "inherently prejudicial and presents a substantial risk of jury confusion."[125]   The distinction between *Pennsylvania Trust Co.* and *In re Tylenol* is that in *Pennsylvania Trust Co.* the plaintiffs attempt to introduce evidence relying solely on Canadian labeling requirements to show the United States warning label was inadequate; whereas, in *In re Tylenol*, the plaintiffs are simply seeking to introduce the evidence as notice there was a potential dosing issue.

This Court agrees with the holding in *In re Tylenol* and applies it to the instant case.  Plaintiffs may offer actions taken by foreign entities to regulate the RnP in their respective countries as evidence of Defendant's notice and/or knowledge of potential issues with the RnP.  If Defendants wish, they make seek a limiting instruction to explain to the jury that a foreign country's regulations are

---

[123] 51 F.Supp.2d 831, 842-43.
[124] *Id.*
[125] *Id.*

not applicable to regulation of the RnP in the United States and the evidence so being offered only as to notice.

For the above reasons, the Court **DENIES** Defendants' Motion.

## EVIDENCE OR ARGUMENT REGARDING THE ROCK 'N PLAY'S RECALL OR RE-ANNOUNVEMENT OF RECALL

Defendants seek to exclude any evidence or argument regarding the post-incident recall on April 12, 2019, or re-announcement of the recall on January 9, 2023 of the Rock 'n Play Sleeper.[126] Defendants assert that the recall and re-announcement constitute a subsequent remedial measure barred by Rule 407, with no applicable exceptions.[127] They further contend that admitting this evidence would be prejudicial, misleading, and unnecessarily time-consuming.[128] In their Response, Plaintiffs argue that the evidence can be used for other purposes, including proving causation, rebutting comparative negligence claims, and impeachment.[129]

Under D.R.E. 407, "when measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction."[130] However, "the court may admit

---

[126] D.I. 299 p.1.
[127] *Id.* p.4.
[128] *Id.* p.12.
[129] D.I. 370 p.2.
[130] D.R.E. 407.

this evidence for another purpose, such as impeachment or, if disputed, proving ownership, control, or the feasibility of precautionary measures."[131]

The April 2019 recall and the January 2023 re-announcement of the recall occurred after the January 2018 incident. This indicates that had the recall been issued before January 2018, it "would have made an earlier injury or harm less likely to occur."[132] Therefore, the recall and the re-announcement are subsequent remedial measures under Rule 407.

Plaintiffs argue the recall and re-announcement can circumvent the subsequent remedial measure exclusion and be admitted for other purposes.[133] Plaintiffs first contend that these materials should be allowed to establish causation.[134] While courts have recognized an exception to Rule 407 for causation, they have also held that the Rule bars the use of subsequent remedial measures to imply causation when such evidence would effectively suggest fault.[135]

In *Velazquez v. Abbott Laboratories,* the court held that recall notices issued by the FDA and the producer's recall of baby formula were inadmissible as subsequent corrective measures under Rule 407.[136] The court noted that recall letters are generally insufficient to establish that the defect which was the subject

---

[131] *Id.*
[132] *Id.*
[133] D.I. 370 p.2.
[134] *Id.* p.4.
[135] *Brazos River Authority v. GE Ionics, Inc*., 469 F.3d 416, 429 (5th Cir. 2006).
[136] 901 F.Supp.2d 279 (D.P.R. 2012).

of the recall was present in the particular product that caused the plaintiff's injuries.[137]   Additionally, the court emphasized that Rule 407 prohibits the admission of subsequent remedial measures taken voluntarily by a defendant, including sending recall notices, and highlighted the prejudicial effect of such evidence.[138]

The recall notices in this case, issued after the 2018 incident, state that "fatalities were reported" following infant rollovers.  They do not directly link the product to any specific injury mechanism applicable to this case.[139]  Nor does the notice admit causation.  Allowing this evidence would create a substantial risk of unfair prejudice by leading the jury to infer that because Fisher-Price recalled the product, a defect caused A.B.'s death.  Moreover, the causation Plaintiffs attempt to establish by introducing this evidence is the type of causation suggesting fault that courts have not allowed.

Plaintiffs also argue the recalls are admissible to rebut comparative negligence.  Several cases have addressed the inadmissibility of subsequent remedial measures to rebut claims of comparative negligence, emphasizing the public policy rationale and the weak probative value of such evidence.[140]  These

---

[137] *Id.* at 303.
[138] *Id.* at 305.
[139] D.I. 370 p.7.
[140] *See Glazer v. Socata S.A.S*, 75 Misc.3d 605, 616 (2022); *Johnson v. State, Dep't of Transp.*, 233 P.3d 1133, 1137 (Ariz. 2010); *see, e.g. Hardy v. Chemetron Corp.*, 870 F.2d 1007, 1011 (5th Cir.1989) ("Evidence of subsequent measures is no more admissible to rebut a claim of non-negligence than it is to prove negligence directly."); *Fasanaro v. Mooney Aircraft Corp.*, 687 F.Supp. 482, 486 (N.D.Cal.1988) ("Plaintiff's attempt to

45

cases collectively underscore the consistent application of Rule 407 to exclude evidence of subsequent remedial measures in the context of rebutting comparative negligence claims.

Plaintiffs also seek to use the recall and re-announcement of the recall to impeach Defendant's witnesses. While impeachment is a valid exception to Rule 407, the exception is not limitless. Courts can restrict the use of subsequent remedial measures for impeachment where their probative value is substantially outweighed by the risk of unfair prejudice or juror confusion.[141] Plaintiffs argue that the recall and press releases are admissible to impeach various defense witnesses, including expert witnesses and corporate representatives. However, impeachment cannot be used as a pretext to introduce evidence that would otherwise be inadmissible under Rule 407. The recall and press release inherently suggest a defect or safety concern, which would lead the jury to infer negligence—the very inference Rule 407 seeks to prevent.

Additionally, several of Plaintiffs' proposed impeachment uses rely on alleged findings and determinations, which are themselves subject to evidentiary limitations and may not directly contradict the testimony of Defendants' witnesses in a meaningful way. Introducing such evidence risks shifting the jury's focus

---

phrase her argument ... as rebuttal of [defendant's] contributory negligence defense is purely semantic.... [S]he argues that the decedent was not contributorily negligent because the defendant was negligent.").
[141] *Petree v. Victor Fluid Power, Inc.*, 887 F.2d 34, 38 (3d Cir. 1989).

from the specific facts of this case to broader regulatory decisions that postdate the incident, further confusing the issues.

For the foregoing reasons, Defendant's Motion in Limine is **GRANTED**.

## LAY OPINION TESTIMONY ON BIOMECHANICS AND MEDICAL CAUSATION

Defendants have moved to exclude Plaintiffs from offering lay opinions on biomechanics and medical causation. Plaintiffs do not oppose this Motion, and it is therefore **GRANTED**. To be clear, Ms. Brown may testify as to how she placed A.B. in the product and what position he was in when she discovered him on the date of the incident. Christine Singleton may testify as to what position A.B. was in when she arrived at the scene of the incident and how she placed his body back in the product that morning after picking him up.

## IMPROPER STATEMENTS AND ARGUMENTS

Defendants have moved to exclude Plaintiffs' counsel from making certain statements about Defendants that have been made in pretrial proceedings. Plaintiffs agree they will not say (1) "RnP is the most dangerous, most lethal infant product ever created in the United States," and (2) "Defendants are baby killers."[142] As to these statements, Defendants' Motion is **GRANTED**.

---

[142] D.I. 358 p.2.

As to the remaining statements set forth by Defendants, any decision on prohibiting these statements will depend upon what evidence is presented and allowed. The lawyers involved in this case are experienced trial lawyers who are familiar with the bounds of what is proper argument and what is not based on the evidence. I expect that both sides will stay within the bounds of proper argument which includes argument that is based on what evidence is actually presented and admitted at trial.

## PLAINTIFFS' MOTIONS

## TESTIMONY OF STEVEN ARNDT

Defendants do not oppose the proposition that Steven Arndt ("Dr. Arndt"), Defendants' human factors expert, cannot offer medical causation opinions.[143] Therefore, the Motion is **GRANTED**, and Dr. Arndt may not offer medical causation opinions.

## TESTIMONY OF CHRISTINE SINGLETON

Christine Singleton ("Ms. Singleton") is the grandmother of A.B. Defendants agree that they will not seek to admit any evidence of Ms. Singleton's litigation history and whether Ameena Brown fell during her pregnancy. In light of this, Plaintiffs' Motion on these points is **GRANTED.**

---

[143] D.I. 363 p.1-2.

Plaintiffs also seek to exclude any testimony regarding Ameena Brown's use and understanding of the subject RnP. Plaintiffs maintain that this testimony is irrelevant and, even if relevant, its probative value is substantially outweighed by its prejudice. Defendants respond that the testimony is relevant and not substantially outweighed by prejudice.

To support their stance, Defendants make several arguments. First, Defendants contend the jury should be able to consider testimony on what, if any, information Ms. Singleton gave Ms. Brown regarding use of the RnP. Defendant further asserts testimony if whether Ms. Brown sought information on the RnP's use from Ms. Singleton goes to Ms. Brown's conduct in making sure she used the RnP safely.[144] This makes sense considering Ms. Singleton testified to having her own RnP.[145] Second, Defendants assert Ms. Singleton should be able to testify to the "full scope of evidence directly relevant to any additional means by which Ms. Brown could have learned about the [RnP], Ms. Singleton's and Ms. Brown's knowledge, and the infant's sleeping arrangement prior to death."[146] Defendants maintain it would be prejudicial towards Defendants if they cannot seek this testimony but Plaintiffs introduce "cherry picked" portions of Ms. Singleton's understanding of the RnP.[147] I agree with this argument and allow Defendants to

---

[144] D.I. 364 p.6-8.
[145] *Id.* p.8.
[146] *Id.* p.9.
[147] *Id.*

elicit testimony concerning Ms. Singleton's personal knowledge and use of the RnP, including any research she conducted in determining the product's safety, as well as her experience with how A.B. was placed to sleep in the RnP and how she discovered A.B. on the morning of the incident.

Based on these reasons, I find that the testimony is relevant and is not substantially outweighed by any unfair prejudice. Therefore, I **DENY** Plaintiffs' Motion.

## STATEMENTS OF APOLOGY OR SORROW AT TRIAL

Plaintiffs move to prevent Defendants from making any statement of apology or sorrow as such remarks are irrelevant. Defendants oppose maintaining that by not being able to say something on this point will support Plaintiffs' claim that the company is uncaring. I normally restrict these kinds of comments to be consistent with the jury instruction given that states the jury cannot base its verdict on sympathy. I am giving that same caution here. However, I am persuaded by Defendants' argument that to allow them to say nothing could paint Defendant as uncaring. I will allow one expression of sympathy or apology during both the opening statement and closing argument. Without prior permission of the Court, no witness may make such a comment.

## STATEMENTS MADE IN CONNECTION WITH THE RETURN OF DECEDENT'S BREATHING EQUIPMENT

Plaintiffs move to exclude any testimony, including the CHOP notes from January 23, 2018, pages 37 and 38, relating to the return of the infant's breathing equipment, on the grounds of relevance.[148]  Defendants maintain that the note is relevant.[149]  The offending note is Dr. Slack's note of 1/23/18 at 1034.  I agree with Defendants that the note is relevant and not unduly prejudicial.  Some of the note goes to the use of the equipment prior to the child's death and goes directly to the defense of causation and comparative fault on the part of the parents.  The statements of the father are admissions and also go to the above issues.  Plaintiffs' Motion is **DENIED.**

### DOCUMENTATION CONCERNING A.B.'S OXYGEN

Plaintiff seeks to exclude from evidence a note from Dr. Bonita where she wrote "per the last pulmonology note (A.B.) was to continue oxygen during feedings and sleep."  Plaintiff seeks to exclude this note arguing that Dr. Bonita's note, when read with the rest of the chart, is clearly a mistake and that if the note were admitted it would cause unfair prejudice and confusion.[150]  Defendants maintain that the note is not a mistake when read in context with the remaining record and that the note is relevant.[151]  I agree with Defendants.  The jury is entitled to hear this testimony as it goes to the mother's actions and to the cause of the

---

[148] D.I. 313.
[149] D.I. 367.
[150] D.I. 316 p.4-6.
[151] D.I. 368 p.6-7.

51

infant's death.  The Plaintiffs are free to call Dr. Bonita to explain the note.

Therefore, Plaintiffs' Motion is **DENIED.**

## COMMON MOTIONS IN LIMINE TO PRECLUDE CUMULATIVE EXCERPT TESTIMONY

Plaintiffs moved to prevent Defendants from offering cumulative expert testimony.[152]  Defendants filed a similar motion.[153]  Each side acknowledged that there will be some overlap in testimony but that each will attempt to limit the overlap.  The Court will also listen to make sure that the overlap is at a minimum and is not merely cumulative.  A specific request is impossible to address at pretrial and will be considered at the time of the trial testimony.

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

*cc:*    Counsel of Record *via File&ServeXpress*

---

[152] *See* D.I. 315.
[153] *See* D.I. 293.